O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN J. WOHL,<br><br>    Petitioner,<br><br>    v.<br><br>KEN CLARK,<br><br>    Respondent. | NO. CV 06-3643-CAS (AGR)<br><br>ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the entire file *de novo*, including the Petition, the Magistrate Judge's Report and Recommendation ("R&R"), the Objections to the R&R filed on April 8 and 9, 2010,[1] and the records and files.[2] Based upon the Court's *de novo* review, the Court agrees with the recommendation of the Magistrate Judge. Petitioner's objections are overruled.

**A.  New Evidence**

"[A] district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's

---

[1] Petitioner's objections consist of 434 single-spaced pages plus 36 numbered exhibits and multiple lettered sub-exhibits.

[2] Respondent did not file a response to Petitioner's objections.

recommendation." *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000). "[I]n making a decision on whether to consider newly offered evidence, the district court must actually exercise its discretion, rather than summarily accepting or denying the motion." *Id.* at 622; *see also Espinoza-Matthews v. California*, 432 F.3d 1021, 1026 n.4 (9th Cir. 2005).

### 1.   Lyle Sardie's Letter

Petitioner argues that "<u>NEW</u> exculpatory evidence . . . <u>first</u> presented by Petitioner at this time" shows that the Long Beach Police Department ("LBPD") fabricated "critical and dispositive . . . evidence." (Objections at 57, 399.) Petitioner attaches a letter dated July 12, 2006, from Lyle Sardie, the owner of the Mariposa Restaurant, where Petitioner was drinking on the night of the crime, to Petitioner. (Objections, Ex. 36-B.) Sardie states that the police searched Mariposa's records "immediately after the accident to try and find out exactly what you had to drink at Mariposa on the night of the accident." Sardie states that he told the police Petitioner was "in the restaurant for a short period of time and I was under the impression that you only had one drink that night because you weren't there for long, and you usually drank beer."[3] Sardie states that when Petitioner left the restaurant, he "looked fine to me at the time." Sardie states that the "police seem to go out of their way to try and tie Mariposa to the accident. A few days later one of the police officers on the street told me that 'We don't have to worry about any lawsuits from your friend anymore' and he just laughed about it." Finally, Sardie stated that although he was told by his attorney not to talk to Petitioner, "I have always wanted to know what really happen [sic] that night, and where you went when you left Mariposa. Also, could you give me the name of your attorney at that time?" (*Id.*)

---

[3] Petitioner testified at trial that he drank two gin and seven-up drinks between 12:30 a.m. and 1:40 a.m. (LD 1 at 627-29.)

2

1 Petitioner states he does not know Sardie and had no communication with him before receiving the letter.  (Objections at 58.)  Petitioner states that the reason he did not seek to introduce this letter before now was because he intended to do so at the evidentiary hearing "which Petitioner fully and completely expected to be certainly ordered, scheduled and held."  (*Id.* at 57.)

In exercising its discretion, the Court declines to consider the new evidence.  Upon receipt of the letter in 2006, Petitioner could have sought leave to expand the record.  *See* Rule 7 of the Rules Governing Section 2254 Cases.  Petitioner's legally unsupported expectation is not an excuse for failing to raise the letter earlier.  Even if the Court were to consider the letter, Petitioner's arguments about the letter's meaning are meritless.  Petitioner highlights the following portion of Sardie's letter:  "A few days later one of the police officers on the street told me that 'We don't have to worry about any lawsuits from your friend anymore' and he just laughed about it. [¶] It kind of scared the hell out of me at the time because I could not understand why you were running from the police."  (Objections at 62-63 (quoting Ex. 36-B).)  Petitioner concludes from those statements that the LBPD fabricated evidence.  However, Petitioner offers no logical connection between Sardie's statements and Petitioner's conclusion.

### 2. Complaints to the LBPD

Petitioner also alleges that in the period between January and June of 2001, he sent "several serious police complaint letters to Long Beach Police Department Chief Jerome Lance . . . concerning a number of repeated and continuing improper and unlawful vehicle traffic stops of Petitioner's three (3) high-profile custom show-car vehicles."  (Objections at 63 (emphases in original).)  Petitioner further alleges that in those letters he threatened lawsuits against the LBPD.  (*Id.*)  Petitioner does not attach copies of the letters. Rather, he states they are "on file with the Long Beach Police Department as direct evidence in this case."  (*Id.* at 64 (emphases in original).)

3

In exercising its discretion, the Court declines to consider this new evidence. Petitioner offers no reason why he failed to refer to these letters in the several years his petition has been pending in federal court.

Moreover, the "AEDPA constrains when the district court may hold an evidentiary hearing or expand the record pursuant to Rule 7 of the Rules Governing § 2254 cases if a state prisoner seeking federal habeas relief has failed to develop the factual record that supports a claim in state court. Section 2254(e)(2) only allows new evidence to be considered in the federal proceeding if, among other requirements, the factual predicate 'could not have been previously discovered through the exercise of due diligence.' '[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.'" *Rhoades v. Henry*, 598 F.3d 511, 517 (9th Cir. 2010) (citation and footnote omitted); 28 U.S.C. § 2254(e)(2)(A). "[A] petitioner who 'knew of the existence of []information' at the time of his state court proceedings, but did not present it until federal habeas proceedings, 'failed to develop the factual basis for his claim diligently.'" *Rhoades*, 598 F.3d at 517 (citation omitted). Here, at the time of the state court proceedings, Wohl clearly knew of the letters he had written, yet failed to present them in the state habeas proceedings. Accordingly, the letters cannot be considered on federal habeas review. *Id.* at 518.

**B. New Ground**

In his Objections, Petitioner raises a new, unexhausted ground not set forth in the Petition. In conjunction with his allegation that he sent letters to LBPD Chief Lance about allegedly improper traffic stops before his arrest (*see* Section A.2 above), Petitioner alleges his trial counsel was ineffective for failing to obtain copies of the letters and present them in Petitioner's defense at trial. (Objections at 413.) Petitioner asserts his counsel was "fully, completely and specifically

4

apprised and aware of the <u>numerous</u> subject serious complaint letters."[4] (*Id.* at 413, 64.)

A petition for writ of habeas corpus cannot be granted unless the petitioner has exhausted his state remedies. 28 U.S.C. § 2254(b)(1). Moreover, Petitioner's new ground rests on facts and evidence that were not presented in state court proceedings. This new evidence cannot be considered on federal habeas review for the reasons discussed above.[5]

**C. Miscellaneous Other Objections**

Petitioner claims the Magistrate Judge should have conducted an independent review of his grounds because they were denied by the California Supreme Court without explanation on May 10, 2006.[6] (Objections at 14.) The Magistrate Judge in fact conducted an independent review of all grounds except Three and Six. (R&R at 8-9.) Grounds Three and Six and were decided in a *reasoned* decision by the California Court of Appeal on direct appeal. (Lodged Document ("LD") 1a; *see* R&R at 2 & n.1.) The California Supreme Court denied review of the Court of Appeal's decision without explanation. (LD 2.) When the California Supreme Court issues a "postcard denial" following a reasoned opinion by the Court of Appeal, a habeas court may "look through" the unreasoned Supreme Court denial to the Court of Appeal's decision to apply the AEDPA

---

[4] Petitioner does not cite any declaration or other evidence from trial counsel to support his argument.

[5] Alternatively, a court may deny an unexhausted claim on the merits when "'it is perfectly clear that the applicant does not raise even a colorable federal claim.'" *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (citation omitted). Even assuming letters complaining about Petitioner's prior traffic stops existed, such letters would at best cut both ways. Accordingly, counsel cannot have been deficient in failing to introduce the letters at trial. *See Bell v. Cone*, 535 U.S. 685, 700-01, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (noting that "sound tactical reasons" supported not calling witnesses who could also provide damaging testimony on cross examination).

[6] The May 10, 2006 decision by the California Supreme Court was on state habeas review. (Motion to Dismiss, Ex. C.)

5

deference standard. *Pham v. Terhune*, 400 F.3d 740 (9th Cir. 2005). The Magistrate Judge did not err.

Ground One was based on insufficiency of the evidence. Petitioner's Objections essentially ask this court to construe the evidence in the light most favorable to him. A habeas court cannot do so. "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed 2d 560 (1979) (emphasis in original); *McDaniel v. Brown*, 130 S. Ct. 665, 673, 175 L. Ed. 2d 582 (2010). A court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt . . . [but] whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[7] *Jackson*, 443 U.S. at 318-19 (citation and quotation marks omitted, emphases in original).

Petitioner argues that Officer Clark admitted "there was <u>no</u> police 'pursuit' of Petitioner's vehicle at <u>any</u> time in this case." (Objections at 22, 68.) However, Officer Clark testified he was in pursuit of Petitioner "when he first took off," then lost sight of Petitioner and turned off his siren while driving east on Broadway, and then turned his siren on again when he saw Petitioner on Gaviota. (LD 1 at 319-23, 366-67, 369-70.) Petitioner focuses exclusively on Officer Clark's testimony, both at trial and the preliminary hearing, about losing sight of Petitioner while driving east on Broadway. (Objections at 22-23, 72 (citing LD 1 at 379[8]), 75

---

[7] A reviewing court must consider all of the evidence admitted by the trial court. *McDaniel*, 130 S. Ct. at 672.

[8] Page 379 of the trial transcript is illustrative. "Q. Counsel asked you whether you were in pursuit when you were traveling eastbound on Broadway, where you were when you were trying to parallel the defendant. Do you recall

6

1  (citing LD 2 at 42).)  Contrary to Petitioner's argument, the R&R addressed
2  Petitioner's contentions.  (R&R at 13-15.)  Viewing the evidence in the light most
3  favorable to the prosecution, as this Court must do, a jury could have found the
4  essential elements of the crime beyond a reasonable doubt based on the record
5  evidence.[9]

6  In describing evidence of Petitioner's conduct on the night of the crime, the
7  Magistrate Judge stated that Petitioner "turned off the headlights while he was
8  driving." (R&R at 17-18.)  Petitioner objects to this description, citing to the
9  testimony of Ghamari.  (Objections at 97 (citing LD 1 at 620).)  Ghamari testified
10 that when Petitioner was driving down 7th Street, there were "[n]o [head]lights at
11 all."  (LD 1 at 618.)  The car's lights were "blacked out."  (*Id.* at 619.)  Petitioner
12 cites the following testimony:

Q   You indicated on direct that you saw the taillights.  Do you mean you saw the taillights on, or did you see just where the taillights would be?

A   He would turn it on briefly then turn them off, and mainly was the brake lights.

Q   You would see brake lights and see him turn off and on his –

A   Yes.

Q   Was that in a rapid on and off flashing motion or on, leave it on and then turn it off and leave it off?

A   Not more than two seconds he would turn on and turn it off.

---

that point?  A.  Yes, I do.  Q.  Now, what do you mean?  How did you understand the word pursuit to mean?"  Officer Clark gave the answer cited by Petitioner. (Objections at 22-23; LD 1 at 379.)  The police reports and preliminary hearing testimony cited by Petitioner similarly relate to the time when Clark was driving east on Broadway.

[9] *See People v. Copass*, 180 Cal. App. 4th 37, 41, 102 Cal. Rptr. 3d 476 (2009) (affirming conviction even though officer turned off his lights for five minutes when he lost sight of defendant).

7

(LD 1 at 620.) Petitioner interprets Ghamari's testimony to mean that the "flickering" was caused by an electrical short. (Objections at 97.)

The R&R's description of the evidence heard by the jury was accurate. Officer Esko and Officer Megas testified they saw the headlights turn off while Petitioner's Corvette was northbound on Orange. (*See, e.g.,* LD 1 at 389, 397-99.) Officer Megas testified the headlights turned off when he first shined a light on the Corvette from the helicopter on Orange, north of 7th street, before the near-collision.[10] (*Id.* at 400-01.) Ghamari clearly testified that the *headlights* were completely off. (*Id.* at 618.)

Petitioner also challenges the R&R's description of Clark's testimony that he told Petitioner it was "over" and to "stop before someone gets hurt." (Objections at 99; *see* R&R at 12.) But this is not a challenge to the fact of what Clark testified. (LD 1 at 326, 341.) Rather, Petitioner merely argues that Clark lied. (Objections at 99-100.) It is for the jury to resolve conflicts in the evidence.[11] *Jackson*, 443 U.S. at 319.

Petitioner objects to the following statement in the R&R: "[T]o the extent Petitioner believes the jury found that the helicopter met all the statutory elements of a police motor vehicle in pursuit, the judge's response to another question by the jury clearly laid that to rest." (Objections at 107 (citing R&R at 15).) The jury asked several questions of the judge during deliberations. On March 5, 2002, at

---

[10] Megas testified he identified Petitioner as the suspect from Officer Clark's pursuit. (LD 1 at 395.) Megas testified he kept the light on the Corvette all the way up to the point when the Corvette turned on Alamitos and continued traveling north on Alamitos until the fatal collision. (*Id.* at 401-02.) Petitioner's speed was tracked at 90 miles per hour. (*Id.* at 402.)

[11] Petitioner also challenges the Magistrate Judge's description of his first "accident" that morning. (Objections at 99.) Petitioner states his car was "<u>never</u> 'sandwiched between a passenger car and a passenger van.'" (*Id.* (citing R&R at 12), emphasis in original).) In that portion of the R&R, the Magistrate Judge described the testimony of Officer Clark, who stated that Petitioner "was in between a white Honda Accord and an 80S Mitsubishi square box kind of van." (LD 1 at 325-26.) Petitioner's contradictory "evidence" is merely his interpretation of the evidence, viewed in the light most favorable to him.

8

11:45 a.m. the jury submitted two written questions: "Is the spotlight on Fox 2 (Police Helicopter), operated by officer Megas, equivalent to the red lamps on a police vehicle? (relative to Count 2) [¶] If not, what would be the equivelant [sic]?". (LD 2 at 175.) The judge answered in writing at 11:55 a.m.: "as to question 1, the answer is no [¶] as to question 2, there is no evidence before them on this issue" (*Id.*)  At 3:01 p.m., the jury submitted two written questions: "(1) must there be (unanimous) agreement that there was a visible red lamp for counts 2 and 6 to prove evasion" [¶] (2) if officers on ground could not keep up w/the defendant due to the high speed of the defendant would the helicopter be considered in pursuit of the defendant?" (*Id.* at 174.)  The judge answered in writing at 3:20 p.m.: "(1) Yes [¶] (2) This is a factual decision.  Please refer to CALJIC 8.21.2 and 12.86" (*Id.*)  CALJIC 12.86 contained, as one of the required elements, that "the peace officer's motor vehicle" "exhibit[ed] at least one lighted red lamp visible from the front." (LD 1 at 868.)

      Petitioner argues that the questions indicate the jury was "improperly and unlawfully looking to the <u>police helicopter</u> as the <u>sole</u> and <u>only</u> possible source of any <u>actual</u> police 'pursuit' of Petitioner's vehicle in this case." (Objections at 108 (emphases in original).)  In the first set of questions, the judge clearly responded that the spotlight on the helicopter was not the equivalent of red lamps on a police motor vehicle.  (LD 2 at 175.)   To the extent Petitioner argues that the jury improperly convicted him based solely on a helicopter pursuit, Petitioner's argument is wholly speculative.[12]

---

[12] The ground for relief to which the jury questions and responses relate is whether there was sufficient evidence of pursuit.  Petitioner's argument does not alter the conclusion that there was sufficient evidence before the jury for a conviction beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 318-19.  Petitioner's attempt to segregate portions of a pursuit does not comport with California law.  *See Copass*, 180 Cal. App. 4th at 41 (officer turned off his lights for five minutes when he lost sight of defendant); *People v. Renteria*, 165 Cal. App. 4th 1108, 1118, 82 Cal. Rptr. 3d 11 (2008) (affirming conviction even though felonious evasion aspects of defendant's flight occurred when pursuit, begun by California highway patrol officer, was continued by federal military personnel that

9

To the extent Petitioner is arguing that the jury was inadequately or erroneously instructed by the trial court's responses, such an objection has no merit. "[A] jury is presumed to understand a judge's answer to its question." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). Here, the trial judge directed the jury's attention to "constitutionally adequate instruction[s]," namely CALJIC 8.21.2 and 12.86. *See id.* No more is constitutionally required. *Id.* Just as in *Weeks*, "[a]t best, petitioner has demonstrated only that there exists a slight *possibility* that the jury" misunderstood or was misled by the judge's answer. *Id.* at 236. By contrast, "to prove a constitutional violation . . ., [Petitioner must] show[] . . . a reasonable *likelihood* that the jury" was misled. *Id.* (emphases in original).

Although Petitioner did not list a ground for ineffective assistance of counsel in his 115-page petition (*see* Petition at 5, 4), he nonetheless imbedded various claims of ineffective assistance in his other grounds, most of which the Magistrate Judge addressed. (*See, e.g.,* R&R at 19 n.10 & 32 n.22.) In his Objections, Petitioner reiterates one claim the Magistrate Judge did not address related to his counsel's response to the jury question, "If officers on ground could not keep up w/the defendant due to the high speed of the defendant would the helicopter be considered in pursuit of the defendant?" Petitioner alleges that his counsel erred in urging the court to advise the jury that this is a fact for them to decide under the court's instructions. (Objections at 111, 113; Petition at 38; LD 1 at 904-05.) Petitioner has not shown prejudice. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The trial court correctly instructed the jury to decide the question by reference to the specific instructions at issue. (LD 2 at 174.) Petitioner cannot show a "reasonable

---

do not constitute peace officers under Cal. Vehicle Code §§ 2800.1, 2800.2).

1 probability that, but for counsel's unprofessional errors, the result of the
2 proceeding would have been different." *Strickland*, 466 U.S. at 694 ("A
3 reasonable probability is a probability sufficient to undermine confidence in the
4 outcome."); *see Williams v. Taylor*, 529 U.S. 362, 391, 120 S. Ct. 1495, 146 L.
5 Ed. 2d 389 (2000).

6 Petitioner also argues that his trial counsel was ineffective for failing "to
7 properly cross-examine" Megas, a helicopter officer, that he was not in pursuit of
8 Petitioner within the legal meaning of the relevant statutes. (Objections at 112.)
9 An attempt by defense counsel to elicit legal conclusions from a lay witness
10 would be objectionable. *See* Cal. Evid. Code § 800; *People v. DeSantis*, 2 Cal.
11 4th 1198, 1226, 9 Cal. Rptr. 2d 628 (1992) ("a lay witness's conclusion about the
12 legal effect of his own actions is incompetent"). Counsel cannot be deficient for
13 failing to ask objectionable questions.

14 With respect to Ground Two (fabricated evidence), Petitioner's allegation
15 that the district attorney charged him with second degree murder on the same
16 day Clark filed a police report is incorrect. (Objections at 133, 137.) Clark filed
17 the police report on July 12, 2001. (*Id.*, Ex. 3-A.) The district attorney filed the
18 Information charging Petitioner with second degree murder on October 19, 2001,
19 three months later. (LD 2 at 103-07.)

20 Petitioner objects that his second degree murder conviction under
21 *Watson*[13] required a finding of implied malice, which is a "subjective standard."
22 (Objections at 144.) Petitioner appears to argue that there was insufficient
23 evidence to find he acted with implied malice. (*Id.* at 144-45.) Petitioner is
24 correct that a finding of implied malice is required. However, implied malice may
25 be proven by circumstantial evidence. *People v. Garcia*, 41 Cal. App. 4th 1832,
26 1849, 50 Cal. Rptr. 2d 127 (1995), *disapproved on other grounds by People v.*

---

28 [13] *People v. Watson*, 30 Cal. 3d 290, 179 Cal. Rptr. 43 (1981).

11

1 *Sanchez*, 24 Cal. 4th 983, 991 n.3, 103 Cal. Rptr. 2d 698 (2001).  Moreover, "[t]he very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act."  *People v. Nieto Benitez*, 4 Cal. 4th 91, 107, 13 Cal. Rptr. 2d 864 (1992).  The R&R thoroughly reviewed the facts in *Watson* and correctly found them "remarkably similar to the facts in Petitioner's case."  (R&R at 16-17.)  Petitioner's argument to the contrary is based on his version of what happened, which the jury heard and did not believe according to its verdict.  (Objections at 145-52.)  Petitioner's arguments are without merit.

Petitioner repeatedly argues that harmless error analysis does not apply when "the trial court directed a verdict for the prosecution."  (*See, e.g.,* Objections at 192, 236, 308 (citing *Rose v. Clark*, 478 U.S. 570, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986).)  Petitioner also repeatedly claims there was a directed verdict in his case.  (*See, e.g.,* Objections at 2, 115, 156, 162, 165-66, 315.)  In *Rose*, the Supreme Court held that harmless error applied to an erroneous malice instruction.  *Rose*, 478 U.S. at 579-80.  *Rose* also stated that "harmless-error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury."  *Id.* at 578.  Petitioner was convicted by a jury after deliberation.  The trial court did not direct a verdict of guilty.  Petitioner's argument to the contrary is rejected.

With respect to instructional error, Petitioner relies on the trial court's imminent peril instruction to the jury to argue that the trial court erred by *not* also giving a necessity instruction.  (Objections at 256.)  Petitioner contends that the imminent peril instruction was a defense to the charge of gross vehicular manslaughter, whereas the necessity defense was a complete defense to second degree murder.  (*Id.* at 256-57.)  The jury convicted Petitioner of second degree murder, but found him not guilty of gross vehicular manslaughter.  (LD 2 at 289, 291.)  According to Petitioner, had the jury been instructed with the necessity defense, he would not have been found guilty of second degree murder.

12

Petitioner is incorrect on at least three fronts. First, the elements of second degree murder and gross vehicular manslaughter while intoxicated are not the same. (*Compare* LD 2 at 237-42 *with id.* at 245.) Second, as the R&R explained, the defense of necessity was *not* a defense to the charge of second degree murder. (R&R at 27 n.21); *see also People v. Anderson*, 28 Cal. 4th 767, 773, 122 Cal. Rptr. 2d 587 (2002) (defense of necessity is not available to justify the killing of an "innocent person"). Finally, in addition to finding that the trial court's refusal to give the necessity instruction was not a violation of due process, the Magistrate Judge also reviewed the Court of Appeal's conclusion that any error was harmless.[14] (R&R at 27.)

Petitioner argues *Richardson v. United States*, 526 U.S. 813, 119 S. Ct. 1707, 143 L. Ed. 2d 895 (1999), held that "petitioner's conviction actually resulted from jury instructions which constituted a directed verdict in the case that were fundamentally defective such that petitioner was actually innocent of the criminal charges for which he was convicted." (Objections at 271.) *Richardson*, which was decided on direct appeal, addressed the question of whether a jury has to agree unanimously about which specific offenses make up the "continuing series of violations" required for a "continuing criminal enterprise." *Id.* at 815. The Supreme Court agreed with defendant that the instruction was deficient and remanded for consideration of whether the instructional error was harmless. *Id.* at 824. *Richardson* had nothing to do with habeas review, a directed verdict, or innocence, and does not provide a basis for habeas relief in this case.

---

[14] Petitioner objects to the R&R's "contention that 'Petitioner could have give up the car (as a) reasonable legal alternative.'" (Objections at 248 (citing R&R at 26).) However, Petitioner misconstrues the R&R. In that portion, the R&R reviewed the trial court's reasons for refusing to give the necessity instruction, one of which was that there were "reasonable legal alternatives." (R&R at 26.)

13

Petitioner objects to the Magistrate Judge's conclusion that the trial court's failure to give a *Sears*[15] instruction was harmless. (Objections at 275.) The Magistrate Judge found that the trial court's failure to give a *Sears* instruction was not constitutional error; therefore, she did not reach the issue of harmlessness. (R&R at 27-28.) Petitioner's citation to the R&R involves the mistake of fact instruction, not the *Sears* instruction. (Objections at 275 (citing R&R at 23).)

In a similar vein, Petitioner distorts the holding of *People v. Yeoman*, 31 Cal. 4th 93, 2 Cal. Rptr. 3d 186 (2003). Petitioner claims that *Yeoman* "clearly and specifically ruled and held that a requested '*Sears*' instruction is <u>required</u> to be given to the jury by law where it '<u>pinpoints the defendant's theory of the defense</u>' to the criminal charges as a matter of long-standing, well-settled and 'clearly established' <u>California Supreme Court law</u>." (Objections at 277 (emphases in original).) Contrary to Petitioner's assertion, and as the R&R correctly explained (R&R at 27), "*Sears* does not require argumentative instructions that merely highlight specific evidence without further illuminating the relevant legal standards."[16] *Yeoman*, 31 Cal. 4th at 152.

In Ground Six, Petitioner argues the trial court erred in refusing to admit a letter from Ms. Hall in which she complained about an incident involving Officer Clark. (R&R at 31; Petition, Ex. 23-A.) Hall stated that when she saw Clark, she could not tell he was a policeman. (*Id.*) Petitioner objects to the following statement in the R&R: "Petitioner does not contend that he could not tell that Clark was a policeman." (Objections at 325 (citing R&R at 32).) When he first

---

[15] *People v. Sears*, 2 Cal. 3d 180, 84 Cal. Rptr. 711 (1970).

[16] Petitioner's reliance on *United States v. Nevitt*, 563 F.2d 406 (9th Cir. 1977), *abrogated by rule change as recognized in United States v. Rowe*, 92 F.3d 928, 933 (1996), is also misplaced. *Nevitt*, decided on direct appeal, rejected the defendant's proposed instruction because it "was not in the form of a statement of appropriate principles of law for the jury to apply to the facts as the jury found them . . . [but instead] in the form of a narrative recitation of Nevitt's version of the facts." *Id.* at 409.

14

1  saw Officer Clark, Petitioner recognized that he was a police officer.  (LD 1 at
2  633-34.)  Petitioner argues that subsequently, he "did not know that Clark was a
3  police officer when Clark screamed violent and direct threats to Petitioner."
4  (Objections at 325 (citing LD 1 at 641-48).)  The R&R's statement and Petitioner's
5  assertion are not incompatible.   Petitioner alleges he did not know Clark was a
6  policeman because he did not see Clark at all at the time he heard the "threats."
7  (R&R at 32 (citing LD 1 at 646).)

8  In Ground Seven, Petitioner argued that the blood alcohol evidence was
9  tainted and spoliated.  Petitioner contends that Officer Clark removed 70% of the
10 preservative from the vial.  Petitioner challenges the R&R's statement that the
11 vacutainer containing Petitioner's blood specimen was "sealed" and that "if
12 preservative had in fact been removed, the seal would have been broken."
13 (Objections at 352 (citing R&R at 21).)  Petitioner argues that the vial had "an
14 easily removeable 'rubber plug' . . . which was certainly removed by Long Beach
15 Police Department personnel."  (Objections at 352 (emphases in original).)  In
16 support of his contention, Petitioner cites the declaration of Nurse McNeil, which
17 stated: "The grey, thick, rubber seal remained intact during and after the injection
18 of the blood sample into the dry, sterilized vacutainer." (Objections at 354 & Ex.
19 35 ¶ 5.)  However, as McNeil testified, the vial was "vacuum sealed."  (LD 1 at
20 511.)  She deposited Petitioner's blood into a "sterilized and sealed vacutainer."
21 (Objections, Ex. 35 ¶ 5.)  If the rubber seal had been removed before being given
22 to Nurse McNeil, the vacuum would have been lost.  *See Bruch v. State*, 954 So.
23 2d 1242, 1243-44 (Fla. Dist. Ct. App. 2007); *see also Quest Diagnostics, Inc. v.*
24 *Director, Div. of Taxation*, 903 A.2d 442, 443 (N.J. Super. Ct. App. Div. 2006)
25 ("The vacutainers are test tubes that are sealed by the manufacturer with a
26 vacuum inside.  In order to draw blood, a trained medical professional inserts a
27 needle into a patient's vein and then punctures the top of the vacutainer's rubber
28 top with the opposite end of the needle.  The puncture breaks the vacuum seal,

1  and the outside air pressure causes suction, which draws blood from the vein
2  through the needle and into the vacutainer.").
3      Petitioner states that Nurse McNeil "was so extremely <u>troubled</u> and very
4  obviously <u>disturbed</u> by the clearly <u>low</u> amount of sodium flouride [sic] <u>preservative</u>
5  in Petitioner's blood test <u>vile</u> [sic] that Nurse McNeil was caused and compelled to
6  find and locate Petitioner at County-U.S.C. Medical Center several <u>days</u> after the
7  fatal motor vehicle accident where Nurse McNeil specifically <u>informed</u> and
8  <u>advised</u> Petitioner <u>through</u> a regular-duty Intensive Care Unit nurse assigned to
9  Petitioner's medical care that there were "<u>serious problems with the blood test</u>"
10 and the "<u>preservative level in the blood vile</u> [sic]." (Objections at 385 (emphases
11 in original).)  If the Court understand's Petitioner's contention properly, he alleges
12 that McNeil told another nurse who in turn told Petitioner that McNeil had
13 problems with the blood test and the preservative level in the blood vial.  As
14 discussed above, to the extent this "evidence" (which involves multiple levels of
15 hearsay) was not presented in state habeas proceedings, it may not be
16 considered in federal habeas review.  Moreover, Petitioner cites nothing in the
17 record in support of his contentions.  McNeil testified at trial that she thought the
18 amount of preservative in the vial "appear[ed] to be low."  (LD 1 at 510-11.)  She
19 did not know what percentage volume of preservative was required.  (*Id.* at 512.)
20 The jury heard and considered this evidence.[17]

---

[17] Defense expert Beckner opined that the proper amount of preservative in a blood vial is 1%.  (R&R at 20 n.12.)  His opinion was based "on the recommendations of other [law enforcement] departments' validation studies." (*Id.* (citing LD 1 at 570).)  Beckner acknowledged he had "not seen any articles in the literature to confirm his opinion." (*Id.*)  Petitioner challenges the R&R's characterization of Beckner's testimony because it omitted Beckner's testimony that he also based his opinion on "validation literature supplied by the manufacturer of the vials."  (Objections at 363-64 (quoting Beckner at LD 1 at 570).)  Beckner had not seen any literature that .3% preservative was inadequate, only that 1% was "recommended."  (LD 1 at 570, 567.)

16

**D.     Remaining Objections**

Petitioner's remaining objections are without merit.

IT IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: May 26, 2010

*Christina A. Snyder*
CHRISTINA A. SNYDER
United States District Judge